# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CORDALL NEAL,

      Petitioner,

v.                                  Case No. 05-CV-74000

RAYMOND BOOKER,

      Respondent.

_____/

## OPINION AND ORDER DENYING HABEAS CORPUS PETITION

Petitioner Cordall Neal has filed an application for the writ of habeas corpus under 28 U.S.C. § 2254.  The habeas petition challenges Petitioner's state convictions for first-degree murder, carrying a weapon with unlawful intent, and possessing a firearm during the commission of a felony (felony firearm).  Respondent Raymond Booker urges the court to deny the habeas petition on grounds that Petitioner's claims are not cognizable on habeas review, are procedurally defaulted, or were adjudicated in accordance with clearly established federal law in state court.  Having reviewed the pleadings and record, the court agrees that Petitioner is not entitled to habeas relief.  Accordingly, the petition will be denied.

## I.  BACKGROUND

### A.  Trial and Direct Appeal

Petitioner's convictions arose from the fatal shooting of Marcus Newsom in Adrian, Michigan on February 9, 2002.  The prosecutor's theory was that Petitioner aided and abetted his relatives who shot Mr. Newsom believing that he was Jamal

Bradley. The defense theory was that Petitioner did not intend to kill anyone and did not aid or assist his relatives in killing Mr. Newsom.  Defense counsel argued that, if Petitioner was guilty of anything, he was guilty of being an accessory after the fact because he merely helped his relatives get away from the crime scene.

The testimony at trial has been summarized by the Michigan Court of Appeals as follows:

> Defendant left his residence in Clinton Township and drove with relatives to Adrian, Michigan to visit his son.  Defendant knew that his relatives carried weapons, although he denied seeing any weapons that evening.  He also knew that his relatives were looking for a particular individual named Jamal Bradley, who had allegedly stolen money from their parents, defendant's grandparents.  Defendant testified that he feared Bradley because he had heard rumors that Bradley was threatening to shoot him.  Yet, he knew that his relatives were seeking Bradley out to determine a repayment schedule for the money he had taken from their parents.  Defendant testified that he drove to the home of his son, but did not stop there because he believed that his ex-girlfriend had a guest over.
>
> Defendant was driving a van with his cousin seated in the front passenger seat and his two uncles seated in the back seat.  Defendant came upon a vehicle that he believed was driven by Bradley.  He was instructed by his relatives to pull up alongside the vehicle because they wanted to talk to Bradley.  He complied and heard a gunshot followed by "all types of gunshots."  Defendant drove off because he "just wanted to assist 'em [sic] to get away."  Defendant testified that there was no plan or discussion to shoot the driver of the vehicle.  The van driven by defendant was stopped a short distance from the shooting.  The weapons used by the occupants had been discarded between the location of the shooting and the location of the traffic stop.  At the police station, defendant learned that Bradley was not driving the vehicle, and Marcus Newsom had been shot and killed instead.
>
> On cross-examination, defendant acknowledged that he had three children who lived in the area, but he only attempted to see his son.  He acknowledged that there was nothing to preclude him from stopping in to visit his son.  Defendant also acknowledged that he made a telephone call to try and locate Bradley when he got into town.  Although he had testified that he was "afraid" of Bradley, defendant nonetheless tried to locate Bradley when accompanied by his relatives whom he assumed were

2

carrying guns.  Defendant could not definitively testify to where the first
gunshot came from.  After the gunshot, defendant "stopped for a second,
then the back swingin' doors comes (sic) open, gunshots, I hear a bunch
of gunshots then."  Defendant knew that his front passenger, his cousin,
was shooting, but he did not know, but guessed, that his uncles were also
shooting.

Witness Carolyn Sue McMillian testified that defendant telephoned her
home on the evening of the shooting and asked her about the
whereabouts of Bradley.  The day after the shooting, McMillian received a
telephone call from defendant.  Defendant apologized to McMillian about
the shooting and advised her that the gunshots were not meant for
Newsom.

*People v. Neal*, No. 246031, 2004 WL 2049768, at *1-2 (Mich. Ct. App. Sept. 14, 2004).

On November 21, 2002, a Lenawee County Circuit Court jury found Petitioner

guilty, as charged, of first-degree (premeditated) murder, Mich. Comp. Laws § 750.316,

carrying a weapon with unlawful intent, Mich. Comp. Laws § 750.226, and felony

firearm, Mich. Comp. Laws § 750.227b.  The trial court sentenced Petitioner to two

years in prison for the felony firearm conviction, followed by concurrent terms of life

imprisonment for the murder and four years, nine months to ten years for the weapons

conviction.

In an appeal of right, Petitioner alleged that (1) the trial court erroneously denied

his motion to suppress his statements to the police, (2) the trial court abused its

discretion when denying his motion to quash the bindover, (3) the trial court erred when

it refused to instruct the jury on self-defense, and (4) the prosecutor committed

misconduct when he commented on the "race card."  The Michigan Court of Appeals

was unpersuaded by these arguments and affirmed Petitioner's convictions in an

unpublished *per curiam* opinion.  *See People v. Neal*, 2004 WL 2049768, at *1.

3

Petitioner raised the same claims and two additional claims in the Michigan Supreme Court.  The two new claims alleged that (1) defense counsel was ineffective because he failed to interview and call crucial witnesses and (2) the prosecutor failed to establish Petitioner's guilt beyond a reasonable doubt.  The Michigan Supreme Court denied leave to appeal on May 31, 2005, because it was not persuaded to review the issues.  *See People v. Neal,* 697 N.W.2d 153 (2005) (table).

### B.  The First Habeas Petition

Petitioner filed a *pro se* habeas corpus petition in this court on October 18, 2005. He asserted the four claims that he raised in the Michigan Court of Appeals and in the Michigan Supreme Court on direct review.  About a month after he filed his habeas petition, Petitioner moved for a stay so that he could exhaust state remedies for the two claims that he raised only in the Michigan Supreme Court.  On April 17, 2006, the court granted Petitioner's motion and closed his case for statistical purposes. [Dkt. #7].

### C.  State Collateral Review

Petitioner then returned to the state court where he raised his unexhausted claims in a motion for relief from judgment.  The trial court denied his motion on the grounds that the issues were previously ruled upon and the court had not been misled by a palpable error.  In an appeal from the trial court's decision, Petitioner alleged that his trial and appellate attorneys provided ineffective assistance and that the prosecutor failed to prove the essential elements of the offenses.  The Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal because Petitioner "fail[ed] to meet the burden of establishing entitlement to relief under [Michigan Court Rule]

4

6.508(D)."  *See People v. Neal*, No. 268249 (Mich. Ct. App. Aug. 16, 2006); *People v. Neal*, 723 N.W.2d 886 (2006) (table).

### D.  The Second Habeas Petition

In 2006, Petitioner filed another *pro se* habeas petition, which was randomly assigned to the Honorable Bernard A. Friedman.  He alleged that: (1) the trial court erred in denying his motion to suppress his statements to the police; (2) the trial court abused its discretion when denying his motion to quash the bindover; (3) the trial court erred in refusing to give a jury instruction on self-defense; (4) the prosecutor deprived him of a fair trial by his inflammatory comments about the "race card;" (5) he was denied effective assistance of counsel due to defense counsel's failure to interview and call material witnesses; and (6) the prosecution failed to establish beyond a reasonable doubt that he aided and abetted the shooter while possessed with the specific intent to kill or knowing that the shooter possessed the specific intent to kill.

The 2006 petition was reassigned to this court as a companion case to the 2005 case.  The court then re-opened the 2005 case, dismissed the 2006 case, and ordered all documents to be filed in the 2005 case. [Dkt. #8].  On July 16, 2008, Petitioner filed a supplemental brief through retained counsel.  Respondent argues in a supplemental answer to the habeas petition that (1) the state court's adjudication of Petitioner's first, third, and fourth claims did not result in an objectively unreasonable application of clearly established Supreme Court law, (2) Petitioner's second claim is not cognizable on habeas review, and (3) Petitioner's fifth and sixth claims are barred by Petitioner's failure to raise those claims on direct review.

### II.  STANDARD OF REVIEW

5

Petitioner is entitled to the writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits–

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.

"[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410 (emphasis in original). "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409.

"Avoiding these pitfalls does not require citation of [Supreme Court] cases – indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam* opinion) (emphasis in original).

6

Furthermore, "§ 2254(d) dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (quotation marks and citations omitted).

## III. DISCUSSION

### A. Petitioner's Statement to the Police

Petitioner alleges that the trial court should have suppressed his written and taped statements to the police, which he claims were invalid because the police interrogated him for an hour or more before advising him of his constitutional rights. See *Miranda v. Arizona*, 384 U.S. 436 (1966).[1] There were three phases of discussion between Petitioner and various officers: a pre-warning conversation with Deputy Sheriff Nathan Adams that at a later point became more of an "interview"; a post-warning conversation with Deputy Adams and Detective Jeffrey LaBarr; and a post-warning conversation with Detective Michael Shadbolt and Detective Wolverton. When the first discussion began to become more specific about Petitioner's version of the events, Deputy Adams read the *Miranda* warnings to Petitioner. Petitioner then made a written statement to Deputy Adams and a tape-recorded statement to Detectives Shadbolt and Wolverton. Petitioner claims that the impropriety of the first discussion or interview with

---

[1] The Supreme Court explained in *Miranda* that,

[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

*Miranda*, 384 U.S. at 444.

7

Deputy Adams, which was conducted before *Miranda* warnings were read to him, tainted his subsequent written statement to Deputy Adams and Detective LaBarr and his taped statement to Detectives Shadbolt and Wolverton.

The Michigan Court of Appeals reviewed Petitioner's claim on the merits and rejected it. The Court of Appeals stated that the trial court's factual findings on the voluntariness of Petitioner's custodial statements were not clearly erroneous and that Petitioner's reliance on *Missouri v. Seibert*, 542 U.S. 600 (2004), was misplaced because Petitioner did not confess to anything before the police read his constitutional rights to him.

### 1. *Miranda, Elstad, Seibert*

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. "Statements made by a defendant in response to interrogation while in police custody are not admissible unless the defendant has first been apprized of the constitutional right against self-incrimination and has validly waived this right." *United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003) (citing *Miranda*, 384 U.S. at 478-79).

In *Oregon v. Elstad*, 470 U.S. 298 (1985), the Supreme Court declined to extend *Miranda* to

> to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.

*Id.* at 309. The police questioned Elstad in his home about a burglary that had occurred in the neighborhood. When the officer stated that he thought Elstad had been involved

8

in the burglary, Elstad made the admission that, "[He] was there."  The police then took Elstad to the police station where he was advised of his constitutional rights for the first time.  He subsequently executed a written confession.  He later sought to suppress his oral statement and written confession on the basis that his statement at the house "let the cat out of the bag" and tainted the subsequent confession.  The trial court suppressed Elstad's oral statement, but admitted the written confession in evidence.

The state court of appeals reversed Elstad's conviction, and the Oregon Supreme Court denied the State's petition for review.  The United States Supreme Court granted certiorari on the question "whether the Self-Incrimination Clause of the Fifth Amendment requires the suppression of a confession, made after proper *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the defendant."  *Id.* at 303.  The Supreme Court held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings."  *Id.* at 318.  The admissibility of any subsequent statement turns "on whether it is knowingly and voluntarily made."  *Id.* at 309.

In *Seibert,* the police interrogated the suspect (Patrice Seibert) for thirty to forty minutes until she made an admission.  After a twenty-minute break, the officer met with Seibert again, informed her for the first time of her *Miranda* rights, and interrogated her a second time until she repeated her pre-warning admission that she knew the victim of her crime was meant to die in a fire that she had arranged.  A majority of justices held that Seibert's warned statement was inadmissible.

9

A plurality of Supreme Court justices focused on whether, in sequential confession cases, "the *Miranda* warnings given could reasonably be found effective." *Seibert*, 540 U.S. at 612 n.4.  The plurality framed the pertinent questions as, did the warnings "effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture?  Could they reasonably convey that he could choose to stop talking even if he had talked earlier?"  *Id.* at 612.  "If yes, a court can take up the standard issues of voluntary waiver and voluntary statement; if no, the subsequent statement is inadmissible for want of adequate *Miranda* warnings, because the earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning."  *Id.*, 540 U.S. at 612 n.4.   Five factors that bear on whether *Miranda* warnings delivered midstream can be effective to accomplish their objective are: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [statements], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first."  *Id.* at 615.

In a concurring opinion, Justice Kennedy took a narrower view than the *Seibert* plurality.  He stated that *Elstad* governs the admissibility of postwarning statements unless a deliberate "two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning."  *Id.* at 622 (Kennedy, J., concurring).  If the deliberate two-step strategy was used,

> postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made.  Curative measures should be

10

designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver.

*Id.* at 622.

## 2. The Facts

The record indicates that Petitioner was arrested shortly after the murder at 9:30 p.m. on February 9, 2002. He was placed in Deputy Nathan Adams' car and taken to the police station, which was part of the Adrian City Hall. They conversed for a while about children, fishing, women, beer, and parties, and Petitioner asked what was going to happen to him. A subsequent interview occurred with Petitioner, Deputy Adams, and Detective LaBarr present. The purpose of this interview was to discuss the homicide. Petitioner asked the same questions regarding whether and when he would be able to leave the police station. Deputy Adams responded that he would be able to answer those questions better after he knew the content of Petitioner's statement.

Deputy Adams proceeded to explain that they were there to talk about what had happened that night. He and Petitioner discussed how Petitioner came to Adrian and what he did during his visit. Initially, there was no discussion about the shooting. Petitioner did most of the talking, and Deputy Adams inquired very little. Petitioner asked a few times when would he be able to go home, but Deputy Adams said that he was not making that decision. Gradually the conversation turned to the incident in question. Deputy Adams then introduced the *Miranda* form and read Petitioner's constitutional rights to him. Petitioner stated that he understood his rights and was willing to waive them. He signed the waiver-of-rights form at 3:13 a.m. Deputy Adams

11

then reviewed the information that Petitioner had provided before Adams read the *Miranda* warnings to Petitioner, and they went into more detail about the homicide.

As Deputy Adams prepared to conclude the interview, Petitioner asked him to write his report there in Petitioner's presence.  Adams replied that he could not do that, but that Petitioner could write his statement so that his own words would be used and included in Adams' report.  Petitioner declined the offer and asked Deputy Adams to write his statement.  Adams proceeded to write down what Petitioner had said.  He went over Petitioner's statement with him word by word, sentence by sentence, as he wrote the statement.  At Petitioner's request, he did not include Information that Petitioner provided to Deputy Adams before the *Miranda* rights were read to him.  Petitioner made several corrections to the written statement and signed it at approximately 4:00 a.m.  The entire interview lasted about two and a half hours.  About one-half of the interview occurred before the *Miranda* warnings were read to Petitioner, and the other half occurred after Petitioner was advised of his constitutional rights.  Deputy Adams informed Petitioner that he could not say whether Petitioner could go home then and that he (Adams) would have to talk to the detectives in charge.  After speaking with the detectives, Deputy Adams informed Petitioner that the detectives wanted to talk to him.  Petitioner agreed to speak with the detectives.

At 5:38 a.m., Detectives Shadbolt and Detective Wolverton reminded Petitioner of his constitutional rights.  Petitioner indicated that he remembered and understood his constitutional rights and was willing to waive them.  The detectives then interviewed Petitioner and tape-recorded his answers.  Their interview concluded at 5:58 a.m. on February 10, 2002.

### 3.  Application

#### a.  The *Seibert* Plurality Opinion

This case is distinguishable from *Seibert* in one important aspect: there is no evidence that the police questioned Petitioner until he made an incriminating remark and then advised him of his constitutional rights and attempted to have him repeat the incriminating remark.  Petitioner confessed to being involved in the shooting incident *after* Deputy Adams advised him of his constitutional rights.  However, because the police did conduct a long, continuous interrogation, the court will apply the *Seibert* factors to consider whether the midstream *Miranda* warnings could have been effective.

The first factor in the *Seibert* test is the completeness and detail of the questions and answers in the first round of interrogation.  The content of Petitioner's unwarned comments to Deputy Adams does not appear in the record because the prosecution agreed not to use those comments at trial.  Deputy Adams testified, however, that he and Petitioner talked about women, children, beer, fishing, and parties before Adams advised Petitioner of his constitutional rights.  Because Petitioner was not asked about the shooting and made no comments about the shooting, the first factor suggests that the subsequent *Miranda* warnings were effective.

The second *Seibert* factor is the overlapping content of the statements.  Petitioner's first interview contained no information about the shooting, whereas his subsequent warned statements contained substantial details about the homicide.  Thus, there was no significant overlap in the content of the pre-warnings statement and the post-warnings statements.  The second factor supports a finding that the *Miranda* warnings could have been effective to accomplish their objective.

13

The remaining factors (the timing and setting of the interviews, the continuity of police personnel, and the degree to which the interrogators treated subsequent rounds as continuous with the first round) tend to suggest that the *Miranda* warnings were *not* effective.  The setting of all three statements was the same:  the police station or City Hall, which were located in the same building, and the interviews were conducted sequentially over a period of several hours.  Deputy Adams began talking with Petitioner during the early morning hours of February 10, 2002.  Adams read the *Miranda* warnings to Petitioner at 3:13 a.m., and Petitioner's admissions followed.  His third and final statement began at 5:38 a.m.

There was continuity of police personnel between Petitioner's unwarned comments and his first warned statement, as Deputy Adams conducted both interviews.[2]  Deputy Adams testified that he was present with Petitioner from the time Petitioner was arrested at 9:30 p.m. on February 9, 2002, until Adams led Petitioner to Detectives Shadbolt and Wolverton sometime after 4:00 a.m. on February 10.  Although there was no continuity of police personnel between the second and third interviews, Petitioner had already made significant admissions during his second interview with Deputy Adams and Detective LaBarr.

It is clear from the record that the police officers treated the interviews as continuous, for there do not appear to have been any significant breaks between the interviews.  Furthermore, when Deputy Adams commenced the second interview, he reviewed the information that Petitioner had related to him prior to the *Miranda*

---

[2]  He was assisted by Detective LaBarr during the second interview.

14

warnings, and he asked Petitioner if he (Adams) had understood Petitioner correctly.

Petitioner responded that he did.  After the second interview, Adams explained to

Petitioner that the detectives wanted to speak with Petitioner.  Detectives Shadbolt and

Wolverton then reminded Petitioner of his constitutional rights and of the statement that

he gave to Deputy Adams, and they proceeded to take a statement from Petitioner.

      To summarize, the content of the warned and unwarned statements differed, and

there was no overlap in content between them, but the setting was the same.  In

addition, there was continuity of police personnel between the first and second

interviews, and the interrogators treated the interviews as one continuous round of

questions.  While the three interviews could be viewed as "parts of a continuum,"

*Seibert*, 540 U.S. at 617, there is no evidence that Petitioner made any incriminating

statements during the first interview.  A reasonable person could have understood the

second interview to be a new phase of the interrogation process, because Deputy

Adams clarified that the purpose of the second interview was to discuss the shooting

incident.  Therefore, the *Miranda* warnings, as carefully explained in Petitioner's case,

could have been effective in apprising a reasonable person of the right to remain silent.

      Furthermore, the subjective evidence indicates that the *Miranda* warnings

actually were effective.  Petitioner testified at trial that he cooperated with the police and

that he made two statements to the police because he was innocent and had nothing to

hide.  He further testified that he had been informed of his rights and that he "didn't have

to talk" and knew he could have remained silent.  (Tr. Nov. 20, 2002, at 184 and 141.)

Petitioner's acknowledgment that he could have remained silent indicates that the

*Miranda* warnings functioned effectively.   Petitioner understood the nature of the rights

15

he was waiving and then chose to talk to the officers, and his admissions were not tainted by any evidence of coercion or improper police tactics. The court concludes that Petitioner's post-warning statements were admissible under *Seibert's* plurality opinion.

### b. Justice Kennedy's Concurring Opinion

Under Justice Kennedy's narrower approach, which most circuits have treated as controlling precedent, *United States v. Pacheco-Lopez*, 531 F.3d 420, 427 n.11 (6th Cir. 2008),[3] the question is whether the two-step interrogation technique (question first, warn later) "was used in a calculated way to undermine the *Miranda* warning." *Seibert*, 540 U.S. at 622 (Kennedy, J., concurring). There is no evidence in the record of a deliberate strategy to undermine or flout *Miranda*. In fact, Deputy Adams seemed to think that he did not have to read the *Miranda* rights to Petitioner until the focus of the interview turned to the details of the homicide. (Tr. Nov. 15, 2002, at 7-10.) Because there was no deliberate strategy to violate *Miranda, Elstad* controls. *Seibert*, 540 U.S. at 622 (Kennedy, J., concurring).

Under *Elstad*, the admissibility of a statement which follows an unwarned statement turns on whether the statement was knowingly and voluntarily made. *Elstad*, 470 U.S. at 309. "As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the

---

[3] The Supreme Court has said that, "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States,* 430 U.S. 188, 193 (1977) (quotation marks and citation omitted). The Sixth Circuit has not resolved the issue of whether the plurality opinion of *Seibert* or Justice Kennedy's concurrence applies. *See Pacheco-Lopez*, 531 F.3d at 427 n.11.

16

suspect in evaluating the voluntariness of his statements.  The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." *Id.* at 318.

Petitioner was almost 29 years of age at the time of his arrest and interrogation by the police.  Deputy Nathan Adams testified that, when he advised Petitioner of his constitutional rights, Petitioner claimed to understand his rights and he agreed to waive them.  He was permitted to use the bathroom, and he was offered something to drink. Petitioner did not appear to be under the influence of drugs or alcohol, he was not having health problems, and he did not ask for medical help.  He was not physically abused or threatened with physical abuse, and he acknowledged in his statements that he had not been threatened or promised anything.  Although he was awake all night, he did not ask to sleep and he did not appear sleepy.  At no point did he request an attorney.  Both Deputy Adams and Detective LaBarr thought that Petitioner knowingly, intelligently, and voluntarily provided a statement.  The entire interview was cordial. Detective Michael Shadbolt testified that Petitioner's statement to him also was knowing, intelligent, and voluntary.  Petitioner himself testified at trial that he cooperated with the police because he was innocent and had nothing to hide.

The record indicates that Petitioner's incriminating post-warnings statements were made knowingly, intelligently, and voluntarily.  Accordingly, the statements were admissible in evidence under Justice Kennedy's framework, and the state court rulings that Petitioner's statements were admissible were objectively reasonable decisions.

### c.  Harmless Error Analysis

17

"Harmless error analysis applies to coerced confessions," *Coomer v. Yukins*, 533 F.3d 477, 488 n.4 (6th Cir. 2008) (citing *Arizona v. Fulminante*, 499 U.S. 279, 295 (1991)), *cert. denied*, __ U.S. __, 129 S. Ct. 1349 (2009), and to confessions admitted in violation of a defendant's Fifth Amendment rights. *Fleming v. Metrish*, 556 F.3d 520, 555 (Clay, C.J., concurring in part and dissenting in part) (citing *Fulminante*, 499 U.S. at 310-11). A constitutional error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

Here, the court finds that, even if the admission of Petitioner's statements constituted error, the error was harmless. The evidence at trial, apart from Petitioner's statements to the police and his own testimony, established that Petitioner called his friend Carolyn McMillian before the shooting to determine whether Jamal Bradley was home alone. On the day after the shooting, Petitioner spoke to Ms. McMillian by telephone from jail and told her that he was sorry and that "it wasn't meant for Marcus" and that "he would not do anything to harm her." He said that he knew for whom the gunshots had been meant, but he did not mention any names. Ms. McMillian, however, testified that, in her opinion, Petitioner had intended the gunshots for Jamal Bradley. Although Petitioner was crying when he called her, she did not know whether Petitioner was upset about the incident or because he got caught for committing it. (Tr. Nov. 19, 2002, at 216-24.)

Petitioner claims that Ms. McMillian's testimony shows only that he knew *after* the murder and *after* having an opportunity to speak to the shooters that the shooters intended to shoot someone. However, an intent to kill may be inferred from any facts in

18

evidence, *People v. Abraham*, 599 N.W.2d 736, 745 (1999) (quotation marks and citations omitted), and "[b]ecause of the difficulty of proving an actor's state of mind, minimal circumstantial evidence is sufficient." *People v. McRunels*, 603 N.W.2d 95, 102 (1999). Gloves and ski masks were found in the van that was linked to the shooting and that Petitioner was driving, and there was testimony that the guns used to kill the victim were thrown out of the van as the police pursued it.

A reasonable juror could have inferred from the evidence, apart from Petitioner's statements to the police and testimony at trial, that Petitioner aided and abetted the shooters, knowing that they intended to shoot and kill someone. Therefore, even if Petitioner's post-warnings statements to the police were erroneously admitted in evidence, the statements could not have had a substantial and injurious influence on the jury's verdict and were harmless.

### B. The Bindover to Circuit Court

The second habeas claim challenges the state district court's transfer of jurisdiction to Lenawee County Circuit Court. Petitioner alleges that the district court abused its discretion when it bound him over for trial and that the circuit court erroneously denied his motion to quash the bindover on the first-degree murder charge. According to Petitioner, the prosecution failed to establish the elements of premeditation and deliberation at the preliminary examination.

The Michigan Court of Appeals noted on review of this claim that, after a defendant goes to trial and is found guilty, it is unnecessary to consider whether the evidence adduced at the preliminary examination was sufficient to warrant a bindover. The Court of Appeals concluded that Petitioner had not alleged a basis for relief.

19

The state appellate court's conclusion is consistent with *Gerstein v. Pugh*, 420 U.S. 103 (1975), in which the Supreme Court held that a conviction cannot be vacated on the ground that the defendant was detained pending trial without a proper determination of probable cause. *Id.* at 119; *see also United States v. Saussy*, 802 F.2d 849, 852 (6th Cir. 1986). In fact, the contention that the state court erred in binding Petitioner over for trial because the prosecution failed to establish sufficient evidence at the preliminary examination "is a state-law issue that does not implicate a federal constitutional right, and is therefore not subject to review in a habeas proceeding." *Shacks v. Tessmer*, 9 Fed. Appx. 344, 351 (6th Cir. 2001) (unpublished opinion citing *Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991)). Consequently, Petitioner is not entitled to relief on the basis of his second claim.

### C. The Jury Instructions

The third habeas claim alleges that the trial court committed reversible error when it refused to instruct the jury on self defense. The Michigan Court of Appeals concluded on review of this claim that the evidence did not support an instruction on self defense.

The question on habeas review of jury instructions is not whether the instructions were "undesirable, erroneous, or even 'universally condemned.'" *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). Instead, before a federal court may overturn a state conviction, the instructions must have violated "some right which was guaranteed to the defendant by the Fourteenth Amendment" or the ailing instructions themselves must have "so infected the entire trial that the resulting conviction violates due process." *Id.* at 146-47. The constitutional right in question here is the right to present a defense. A

20

defendant is entitled to a jury instruction on "any recognized defense for which there

exists evidence sufficient for a reasonable jury to find in his favor."  *Mathews v. United

States*, 485 U.S. 58, 63 (1988) (citing *Stevenson v. United States*, 162 U.S. 313 (1896)).

In Michigan,

> "[t]he killing of another person in self-defense is justifiable homicide only if
> the defendant honestly and reasonably believes his life is in imminent
> danger or that there is a threat of serious bodily harm and that it is
> necessary to exercise deadly force to prevent such harm to himself."
> *People v. Riddle*, 467 Mich. 116, 127; 649 NW2d 30 (2002).  The first
> requirement of a claim of self-defense or defense of others is that a
> defendant act in response to an assault.  *Detroit v. Smith*, 235 Mich. App
> 235, 238; 597 NW2d 247 (1999).  To act in lawful self-defense when a
> defendant uses deadly force, the defendant must have an honest and
> reasonable belief of the danger of serious bodily harm or death and may
> only employ the amount of force necessary to defend himself.  *People v.
> Heflin*, 434 Mich. 482, 507-509; 456 NW2d 10 (1990).  To satisfy the
> necessary element of self-defense, the defendant must try to avoid the
> use of deadly force if he can safely do so by applying nondeadly force or
> utilizing an avenue of retreat.  *Riddle*, *supra* at 119.

*Neal*, 2004 WL 2049768, at *3.

Petitioner told the police that his relatives had fired at the victim because they

thought he was Jamal and that he was going to shoot at them.  Petitioner claimed that

gunshots were fired from the car the victim was driving, as well as from the van that he

was driving, but he was not specific about who shot first.

At trial, Petitioner testified that he had heard rumors about Jamal Bradley wanting

to shoot him.  Petitioner admitted, however, that he and his relatives went looking for

Jamal, who was known to carry a gun, and that they pulled up alongside of a car

resembling the one that Jamal drove.  Petitioner heard one gunshot, stopped for few

seconds, and then heard several more gunshots after the back doors of the van swung

open.  Gunshots came from the back of the van and from the front passenger door of

the van where Petitioner's cousin was seated.  He drove off and was told to turn off his headlights.  He headed out of the city instead of waiting for the police to arrive, and when the police subsequently interrogated him, he declined to inform them that his relatives had fired at the victim from the van.

The police found a bullet fragment inside the van and a bullet hole on the outside of the van, but an expert witness testified that the bullet fragment was fired by one of the guns which Petitioner's relatives discarded when they noticed the police following them.  Thus, it is not plausible that the victim fired the bullet fragment which was found in the van.  There was additional evidence that Petitioner knew the shooting was meant for Jamal Bradley.

The evidence, as summarized above, indicates that Petitioner did not have an honest and reasonable fear that his life was in imminent danger or that it was necessary to exercise deadly force to prevent harm to himself or to his companions.  He pursued the victim, as opposed to responding to an assault.  Petitioner's conduct after the shooting also belies a self-defense theory.  Instead of waiting for the police or reporting the crime, he left the crime scene and headed out of town.  Weapons used in the shooting were discarded before the police stopped him.

There was insufficient evidence for a reasonable jury to find that Petitioner acted in self defense.  Therefore, Petitioner had no right to a jury instruction on self defense, and the state appellate court's conclusion did not result in an unreasonable application of Supreme Court precedent.

### D.  The Prosecutor's Remarks

22

During his closing argument, defense counsel pointed out that Petitioner was a young African American and that the jury consisted of Caucasians. Defense counsel then reminded the jurors that the trial court had instructed them not to be swayed by bias, but to judge the case solely on the evidence produced in court.

On rebuttal, the prosecutor said that he wondered at the beginning of the trial "how long it would take before somebody would play the race card." He calculated that "it took 48 hours and 20 minutes for that race card to get played." (Tr. Nov. 21, 2002, at 25.) Petitioner alleges that these inflammatory remarks deprived him of a fair trial by inflaming the jury's emotions.

The Michigan Court of Appeals found no merit in this claim. It determined that reversal was unnecessary because the prosecutor was responding to an issue raised by defense counsel, the discussion was limited in duration and scope, and the trial court had said that the attorneys' arguments were not evidence.

"The Constitution prohibits racially biased prosecutorial arguments." *McCleskey v. Kemp*, 481 U.S. 279, 309 n.30 (1987) (citing *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)). Consequently, the prosecutor's "race card" comment was improper. It could have "inflamed the emotions of the jury and resulted in a verdict based on something other than the evidence." *United States v. Richardson,* 161 F.3d 728, 736-37 (D.C. Cir.1998).

Because the prosecutor's comment was improper, the remaining question is whether the comments were flagrant, *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006), *cert. denied*, 549 U.S. 1255 (2007), and "so egregious . . . as to render the entire trial fundamentally unfair." *Cook v. Bordenkircher*, 602 F.2d 117, 119 (6th Cir. 1979).

23

When determining whether a prosecutor's conduct was flagrant, courts must consider "(1) whether the remarks tended to mislead the jury or to prejudice the accused; (2) whether they were isolated or extensive; (3) whether they were deliberately or accidentally placed before the jury; and (4) the strength of the evidence against the accused." *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994).

Although the prosecutor's "race card" comment was deliberately made, it was an isolated remark, which likely did not mislead the jury or prejudice Petitioner for the following reasons. First, race was not an issue during trial, except to the extent defense counsel first injected it with his argument, as noted by the court of appeals. Second, the evidence against Petitioner was substantial. Third, defense counsel objected when the prosecutor made the comment, and the trial court implicitly sustained the objection by stating that the prosecutor's comments were "inappropriate." The trial court also charged the jurors at the conclusion of the case not to let sympathy or prejudice influence their decision, but to set aside any feelings of bias or prejudice based on the race or national origin of witnesses. The trial court stated that the attorneys' arguments were not evidence and that the jurors should accept what the lawyers said only if the lawyers' arguments were supported by the evidence or by the jurors' own common sense and general knowledge. (Tr. Nov. 21, 2002, at 31, 33, and 35.)

The court concludes that, although the prosecutor's isolated remark was not proper, it was also not flagrant. Therefore, the state appellate court's finding that Petitioner's prosecutorial-misconduct claim lacked merit did not result in an unreasonable application of clearly established federal law.

### E. Alleged Ineffective Assistance of Counsel; Sufficiency of the Evidence

Petitioner's fifth claim alleges ineffective assistance of trial and appellate counsel. The sixth and final habeas claim challenges the sufficiency of the evidence supporting Petitioner's convictions.  Respondent asserts that these claims are barred from review by Petitioner's failure to raise the claims on direct review of his conviction and the state courts' rejection of the claims pursuant to Michigan Court Rule 6.508(D).

### 1. Procedural Default

"[P]rocedural default results where three elements are satisfied:  (1) the petitioner failed to comply with a state procedural rule that is applicable to the petitioner's claim; (2) the state courts actually enforced the procedural rule in the petitioner's case; and (3) the procedural forfeiture is an 'adequate and independent' state ground foreclosing review of a federal constitutional claim." *Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003) (quoting *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986)).  All three elements are satisfied here.  First, there is a state procedural rule applicable to Petitioner's claims.  Michigan Court Rule 6.508(D)(3) prohibits state courts from granting relief from judgment if the defendant alleges nonjurisdictional grounds that could have been raised on appeal from the conviction or sentence.  An exception exists if the defendant can demonstrate "good cause for failure to raise such grounds on appeal" and "actual prejudice from the alleged irregularities that support the claim for relief." *Id*.  Petitioner violated the spirit of this rule by failing to raise his claim about trial counsel (Claim V) and his challenge to the sufficiency of the evidence (Claim VI) in the Michigan Court of Appeals on direct review.[4]

---

[4]  Claim V also alleges ineffective assistance of appellate counsel.  This portion of Petitioner's fifth claim is not procedurally defaulted, because an appellate attorney

25

Second, the state courts enforced the rule.  Both the Michigan Court of Appeals and the Michigan Supreme Court relied on Rule 6.508(D) to deny relief when Petitioner raised the claims in his state collateral appeal.  The state courts' reliance on Rule 6.508(D) is a sufficient basis for this court to conclude that the orders were based on a state procedural bar.  *Burroughs v. Makowski*, 282 F.3d 410, 413-14 (6th Cir. 2002).

The third element (adequate and independent basis) also was satisfied.  Rule 6.508(D) was an adequate and independent basis for the state courts' orders because the rule was "firmly established and regularly followed" before Petitioner appealed his convictions in 2003.  *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir.1998) (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)).

All three elements of a procedural default are present in this case.  Petitioner, therefore, must demonstrate "cause and prejudice" for his procedural default or that a miscarriage of justice will occur if this court fails to consider the substantive merit of his claims.  *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

## 2.  "Cause"

Petitioner alleges that his appellate attorney was ineffective for failing to raise his claims about trial counsel and the sufficiency of the evidence on direct appeal.  Constitutionally ineffective assistance of counsel is "cause" for a procedural default, but "[a]ttorney error short of ineffective assistance of counsel . . . does not constitute cause and will not excuse a procedural default."  *McCleskey*, 499 U.S. at 494 (citing *Murray v.*

---

cannot be expected to complain about his own ineffectiveness on appeal.  *Combs v. Coyle*, 205 F.3d 269, 276 (6th Cir. 2000).  State collateral review was Petitioner's first opportunity to raise his claim about appellate counsel at all levels of state court review. *Hicks v. Straub*, 377 F.3d 538, 558 n. 17 (2004).

*Carrier*, 477 U.S. 478, 486-88 (1986)).  To prove that his appellate attorney was constitutionally ineffective, Petitioner must show that his attorney's performance was deficient and that the deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  An appellate attorney need not raise every nonfrivolous argument urged by the appellant if counsel decides, as a matter of professional judgment, not to raise those arguments.  *Evitts v. Lucey*, 469 U.S. 387, 394 (1985); *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

Furthermore, "it is difficult to demonstrate that an appellate attorney has violated the performance prong [of the *Strickland* test] where the attorney presents one argument on appeal rather than another.  In such cases, the petitioner must demonstrate that the issue not presented 'was clearly stronger than issues that counsel did present.'"  *Caver v. Straub*, 349 F.3d 340, 348 (6th Cir. 2003) (quoting *Smith v. Robbins*, 528 U.S. 259, 288 (2000)).  To determine whether Petitioner's appellate attorney was constitutionally ineffective and "cause" for Petitioner's procedural default, the court will briefly review Petitioner's fifth and sixth claims to determine whether there is a reasonable probability that inclusion of the omitted issues would have changed the result of the appeal.  *Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005) (citing *Greer v. Michell*, 264 F.3d 663 (6th Cir. 2001)).

### a.  Trial Counsel

Petitioner alleges that his trial attorney failed to interview and call witnesses whose testimony would have materially impacted the issue of guilt or innocence.  According to Petitioner, Jessica Ybarra would have testified that Petitioner left Clinton Township with her, not his relatives, and that it is unlikely Petitioner knew his relatives

27

were armed or planning to commit a criminal offense. Jennifer Ybarra allegedly would have testified that Petitioner was not upset or crying when he spoke to Carolyn McMillian over the telephone and said that he "didn't do it."

Defense counsel subpoenaed the two Ybarra sisters to testify in Petitioner's defense. However, after consulting Petitioner, defense counsel informed the trial court that they did not intend to produce the Ybarras as witnesses because of the way the testimony had developed. Petitioner assured the trial court that his attorney's explanation was correct. (Tr. Nov. 20, 2002, at 130.)

Petitioner's express waiver of the sisters as witnesses was a legitimate basis for not raising an appellate claim about trial counsel's failure to produce the sisters. Furthermore, the girls' affidavits are unpersuasive. Jessica Ybarra's affidavit states that Petitioner did not drive to Adrian with his relatives and could not have been involved in the crimes because he was with her. This statement contradicts Petitioner's own testimony that he picked up his uncles and cousin and drove to Adrian with them. (*Id.* at 140, 143-44.)

Jennifer's affidavit states that Petitioner called her from jail and asked her to call Milton Russell. She claims to have listened to a subsequent telephone call in which Petitioner talked to Carolyn McMillian and claimed that he "didn't do it." Petitioner, however, testified that he called Mr. Russell and then talked to Carolyn McMillian. (*Id.* at 150.) Neither he, nor Mr. Russell, claimed that Jennifer Ybarra facilitated the call or eavesdropped on the conversation.

Jennifer also claims in her affidavit that Petitioner was not crying or upset during the conversation. Ms. McMillian testified otherwise (Tr. No. 19, 2002, at 217), and

28

Petitioner admitted at trial that he was upset about the death of Marcus Newsom (Tr.
Nov. 20, 2002, at 150.)

The court concludes that trial counsel was not ineffective for failing to produce
Jessica and Jennifer Ybarra as witnesses. Because "trial counsel performed
adequately, [the court's] inquiry is at an end; by definition, appellate counsel cannot be
ineffective for a failure to raise an issue that lacks merit." *Greer*, 264 F.3d at 676.

### b. Sufficiency of the Evidence

Petitioner contends that the prosecution failed to establish that he was a
knowing and willing participant in the crimes and possessed an intent to kill or knew that
his relatives intended to kill the victim. As for his firearm convictions, Petitioner alleges
that the prosecutor failed to show that he possessed a handgun or aided and abetted
anyone else in possessing a handgun. Petitioner asserts that, at best, the prosecution
proved he was merely present in the vehicle suspected of being involved in the crimes.
He claims that there is no basis for inferring that he knew what his relatives were
planning to do or that he was a knowing participant in the crimes.

The prosecutor's theory was that Petitioner aided and abetted his relatives by
driving them to Adrian and helping them locate the vehicle associated with Jamal
Bradley. The prosecutor maintained that Petitioner and his relatives' intent to kill Jamal
was transferred to Marcus Newsom, whom they mistook for Jamal.

Although there was no evidence that Petitioner personally possessed a gun, he
left Clinton Township with three relatives whom he assumed had weapons because they
usually were armed. There was evidence that he called Carolyn McMillian before the
shooting to determine whether Jamal Bradley was at home. Then he and his relatives

29

sought out Jamal even though Petitioner purportedly went to Adrian to see his son and knew that Jamal had been threatening to shoot him.  Petitioner pulled up next to the victim's car, which he thought was Jamal's car, and heard his relatives fire their guns. He then drove out of town, and the weapons used in the shooting were tossed out of the van when the group realized that the police were following them.

A rational trier of fact could have inferred from the evidence that Petitioner aided and abetted his relatives in killing Marcus Newsom with guns and that Petitioner intended to kill Jamal Bradley or knew that his relatives possessed the intent to kill Jamal.  Petitioner's intent was a question of fact for the jury to decide, *People v. Neal*, 506 N.W.2d 618, 621 (1993), and minimal circumstantial evidence was sufficient to show his intent.  *McRunels*, 603 N.W.2d at 102.

Even if appellate counsel was remiss for failing to challenge the sufficiency of the evidence, the deficient performance did not prejudice the defense because the Michigan Court of Appeals determined that sufficient evidence of premeditation and deliberation existed to support the bindover to circuit court.  The court of appeals in all likelihood would have reached the same result if appellate counsel had challenged the sufficiency of the evidence at trial.

The court concludes that Petitioner's claims about trial counsel and the sufficiency of the evidence lack merit.  Therefore, appellate counsel was not ineffective for failing to raise those claims in the appeal of right.  *Greer*, 264 F.3d at 676.

### 3.  Prejudice; Miscarriage of Justice

The court need not determine whether Petitioner was prejudiced by the alleged constitutional errors, because he has failed to show that appellate counsel was constitutionally ineffective and "cause" for his procedural default.  *See Willis*, 351 F.3d at 746 (citing *Simpson v. Jones*,  238 F.3d 399, 408 (6th Cir. 2000)).  The narrow exception for fundamental miscarriages of justice is reserved for the extraordinary case in which the alleged constitutional error probably resulted in the conviction of one who is actually innocent of the underlying offense.  *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Carrier*, 477 U.S. at 496.  A claim of actual innocence "requires [the] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial."  *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

Although the affidavits of the Ybarra sisters are new evidence, they are not persuasive or reliable evidence of actual innocence.  Therefore, a miscarriage of justice will not occur as a result of the court's failure to consider the substantive merits of Petitioner's claims about his trial attorney and the sufficiency of the evidence.

## IV.  CONCLUSION

Petitioner's fifth and sixth claims are procedurally defaulted, his second claim is not cognizable on habeas review, and the state court's rejection of Petitioner's other claims did not result in decisions that were contrary to, or an unreasonable application of, Supreme Court precedent.  Accordingly,

IT IS ORDERED that the petitions for a writ of habeas corpus [Dkt. #1 and #9] are DENIED.

31

 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  May 29, 2009

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, May 29, 2009, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522

S:\Cleland\JUDGE'S DESK\C3 ORDERS\05-74000.Neal.bh.wpd